IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

————————————

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**RICKY ALONZO HIPPENSTEEL,**
*Appellant.*

————————————

No.   CR-25-0203-PR
**Filed June 1, 2026**

————————————

Appeal from the Superior Court in Maricopa County
The Honorable Justin Beresky, Judge
No.   CR2021-123897-001

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

————————————

Opinion of the Court of Appeals,
Division One
572 P.3d 579 (App. 2025)

**VACATED**

————————————

COUNSEL:

Damon A. Rossi (argued), Deputy Public Defender, Maricopa County Office of the Public Defender, Phoenix, Attorneys for Ricky Alonzo Hippensteel

Kristin K. Mayes, Arizona Attorney General, Alice M. Jones (argued), Deputy Solicitor General/Section Chief of Criminal Appeals, Phoenix, Attorneys for State of Arizona

Kevin D. Heade, Arizona Attorneys for Criminal Justice, Florence, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

_____

CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which VICE CHIEF JUSTICE LOPEZ, JUSTICES BOLICK, BEENE, KING, and CRUZ joined.   JUSTICE MONTGOMERY dissented.

_____

CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        A jury convicted Ricky Alonzo Hippensteel of second degree murder after he stabbed Derek Joseph Odle.   Without objection, the trial court incorrectly instructed the jury on the crime of provocation manslaughter, *see* A.R.S. § 13-1103(A)(2), and provided a flawed verdict form.   The issue here is whether these errors constituted fundamental, prejudicial errors requiring a new trial.   We conclude they did.

## BACKGROUND

¶2        In June 2021, Hippensteel and Odle were friends living in Tonopah, Arizona.   In the early morning hours of June 25, Hippensteel sought out Odle in an informal compound of mobile homes and other structures.   The two men fought outside a trailer where Odle was staying, and Odle was stabbed to death.   The State indicted Hippensteel for first degree murder and related lesser offenses.

¶3        At trial, Hippensteel testified and did not deny stabbing Odle but asserted he acted in self-defense and to prevent a crime (assault).   According to Hippensteel, he approached Odle outside Odle's trailer to discuss a missing tractor while Odle was using a knife to scrape or cut wires.   The two began arguing, and at some point, Hippensteel looked away.   When he turned back, he saw Odle raise the knife toward him, prompting Hippensteel to react immediately by blocking the knife, thereby sustaining a stab wound to his hand.   The confrontation then escalated into a physical fight involving "grabbing, hitting, throwing, [and] punching," during which Odle was fatally stabbed.   Hippensteel told jurors that he did not remember stabbing Odle, and that when he left the

scene, Odle was "standing alive." The prosecutor impeached Hippensteel with evidence that he previously told a detective he had not seen Odle for two weeks or been to the compound for years. Hippensteel admitted lying to the detective but claimed he was telling the truth to the jury.

¶4          Kathleen Abrigo, Odle's girlfriend, provided the jury with a different version of events. Abrigo testified that she and Odle were asleep in the trailer when Hippensteel stood outside yelling about taking Odle's car. Abrigo woke Odle and told him to go talk to Hippensteel, and Odle did so, asking "what's up?" From inside the trailer, Abrigo watched the exchange through a window and saw Hippensteel apparently punching Odle until Odle fell against the trailer, staggered, and then collapsed. According to Abrigo, Odle did not have a knife and did not take any action against Hippensteel. Abrigo called 9-1-1 and exited the trailer, where she saw Hippensteel standing over Odle, holding a small knife. According to Abrigo, Hippensteel told Odle something like "this is what you get for stealing my shit, punk." Abrigo also testified that while she was still on the phone, Hippensteel threatened her not to provide his name to authorities and then fled. When asked whether she had previously seen Hippensteel with a knife, Abrigo answered yes, explaining "we all have them." Hippensteel denied seeing Abrigo that day.

¶5          Other witnesses corroborated aspects of both Hippensteel's and Abrigo's accounts but also offered testimony that conflicted with each. Donald Parker testified that Hippensteel stopped by his trailer shortly before the stabbing and said he was going to kill Odle for "ransacking his place earlier that morning." Parker said Hippensteel calmed somewhat after Parker explained that Odle had been in his trailer all night. He saw Hippensteel walk in the direction of Odle's trailer, but he did not see him with a knife. Later, Parker saw Hippensteel return and said he was flipping a knife and appeared agitated.

¶6          Joseph Abriani's testimony conflicted with Parker's. Abriani testified that he was outside and that Parker was nearby speaking with Ruben Ruiz when Hippensteel walked up and asked if Odle was around. After Abriani said he believed Odle was in his trailer, Hippensteel walked off toward the trailer. Abriani did not see Hippensteel with a knife or hear him making threats towards Odle. Abriani did not see Hippensteel returning or flipping a knife, as Parker asserted, even though Abriani and Parker were together until paramedics arrived to treat Odle.

¶7        Jonathan Kelly testified that Hippensteel knocked on the door of Kelly's Winnebago, which was near Odle's trailer, entered visibly upset, and spoke about taking Odle's car.   Kelly further testified that Hippensteel then saw Odle outside his trailer, made "a beeline" toward him, and appeared to punch him.   Kelly did not see Odle fight back.

¶8        Lorena Cluck, Ruben Ruiz, and Angelica Bailon were also inside Kelly's Winnebago during Hippensteel's visit.   Cluck testified that Hippensteel stated there "might be a murder" on the property and that he wanted to take Odle's car.   Ruiz testified that he saw Odle fall and, upon going outside, observed Hippensteel, who appeared angry, holding a knife and telling Abrigo not to call 9-1-1.   Bailon testified that Hippensteel and Odle were friends, but Hippensteel was angry at Odle that morning for "ditch[ing] him somewhere."

¶9        The jury also heard testimony that Odle and several witnesses were using drugs at the time of the incident.   At the time Odle died, his blood alcohol concentration was 0.03%, and toxicology reports revealed levels of amphetamines, methamphetamine, and THC, the primary psychoactive compound found in cannabis.   The toxicology report also stated that the level of methamphetamine found was "capable of causing hallucinations, aggressive behavior[,] and irrational reactions."   Ruiz and Bailon testified that they were high on drugs that morning, and Ruiz also said that he and Kelly were getting high in the Winnebago when Hippensteel stopped in.   Kelly denied this.   An officer testified that Abrigo originally said she had been smoking drugs with Odle that morning before Hippensteel arrived.

¶10       The jury's fact finding was undoubtedly complicated by differing versions of events, the drug use that may have muddled observations and memories, and the fact that Hippensteel and all the above-named witnesses, except Abriani, were impeached with prior inconsistent statements.   Tellingly, the jurors asked witnesses more than fifty questions.

¶11       Without objection, the trial court used Revised Arizona Jury Instructions ("RAJIs") to instruct the jury on first degree murder, second degree murder, provocation manslaughter, negligent manslaughter, aggravated assault, unlawful flight, and resisting arrest.   Ultimately, the jury found Hippensteel guilty of second degree murder, unlawful flight,

and resisting arrest. It found him not guilty of committing aggravated assault against Abrigo. After the verdicts were read, defense counsel told the court that the verdict form should have required the jury to separately state whether it considered provocation manslaughter. But counsel did not ask for any relief, and the court did not take action. The court sentenced Hippensteel to concurrent prison terms, including nineteen years for second degree murder. In a divided opinion, the court of appeals affirmed. *See State v. Hippensteel*, 572 P.3d 579, 580 ¶ 1 (Ariz. App. 2025).

¶12 We granted review of Hippensteel's petition for review because whether the jury instructions and verdict forms given resulted in fundamental, prejudicial error is an issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

¶13 Hippensteel argues that the trial court committed reversible error by giving an incorrect jury instruction and verdict form to the jury. Because he did not raise this objection to the trial court, we review for fundamental, prejudicial error. *See State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). To establish such error, Hippensteel must initially demonstrate that the court committed error. *See id.* at 142 ¶ 21. If error exists, he must also show that under the totality of the circumstances, "(1) the error went to the foundation of the case, (2) the error took from [him] a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *Id.* "If [Hippensteel] establishes fundamental error under prongs one or two," he must separately show prejudice. *See id.* If he establishes fundamental error under the third prong, he has also shown prejudice, and we must grant him a new trial. *See id.*

**A. The Trial Court Incorrectly Instructed The Jury On Provocation Manslaughter And Provided An Erroneous Verdict Form**

¶14 The parties do not dispute that the trial court incorrectly instructed the jury on provocation manslaughter and provided an erroneously worded verdict form. To place these errors in context, we first review the elements of second degree murder and provocation manslaughter.

¶15 A person commits second degree murder, a class one felony, if, without premeditation, the person intentionally, knowingly, or, "[u]nder

circumstances manifesting extreme indifference to human life," recklessly causes the death of another. A.R.S. § 13-1104(A)(1)–(3), (C). A person commits provocation manslaughter, a class two felony, by committing second degree murder "on a sudden quarrel or heat of passion resulting from adequate provocation by the victim." § 13-1103(A)(2). Notably, because provocation manslaughter includes an additional element, it is *not* a lesser included offense of second degree murder. *See State v. Lua*, 237 Ariz. 301, 303 ¶ 7 (2015). Instead, provocation manslaughter is a less serious degree of homicide that carries a reduced punishment. *See id.*

**¶16** In *Lua*, this Court clarified potential confusion stemming from our decision in *State v. LeBlanc*, 186 Ariz. 437 (1996), when provocation manslaughter is at issue. *See Lua*, 237 Ariz. at 306 ¶ 19. In *LeBlanc*, we stated that a "jury may deliberate on a lesser offense if it either (1) finds the defendant not guilty on the greater charge, or (2) after reasonable efforts cannot agree whether to acquit or convict on that charge." 186 Ariz. at 438. We, therefore, directed trial courts to give this "reasonable efforts" instruction "in every criminal case involving lesser-included offenses." *Id.* at 440. But, because provocation manslaughter, a less serious offense, can only be committed if the defendant also committed second degree murder, a more serious offense, we explained in *Lua* that a *LeBlanc* instruction is improper in that circumstance. *See Lua*, 237 Ariz. at 306 ¶ 19. Instead, the court should instruct the jury as follows:

> If you find the elements of second-degree[1] murder proven beyond a reasonable doubt, you must consider whether the homicide was committed upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim. If you unanimously find that the homicide was committed upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim, then you *must* find the defendant guilty of manslaughter rather than second-degree murder.

*See id.* ¶ 20 (emphasis added) (quoting Rev. Ariz. Jury Instr. (Crim.) 11.04, at 107 (3d ed. 2008)). This instruction enables the jury to distinguish

---

[1] Because A.R.S. § 13-1104 and § 13-1105 do not hyphenate "second degree murder" or "first degree murder," we do not hyphenate the phrases. For any quoted material containing the hyphenated phrases, however, we retained the hyphen.

between second degree murder and provocation manslaughter and to return a verdict on the less serious offense when warranted. *See id.* at 307 ¶ 20.

¶17 Here, the trial court gave the *Lua* instruction as part of its instruction on second degree murder as a lesser included offense of first degree murder. Specifically, the court instructed the jury that if it found that Hippensteel committed all the elements of second degree murder, it *must* consider whether he killed Odle upon a sudden quarrel or heat of passion resulting from an adequate provocation by Odle. If the jurors unanimously found that circumstance, the court instructed they *must* convict Hippensteel of manslaughter. The instruction did not define "adequate provocation."

¶18 The court then incorrectly gave a *LeBlanc* instruction on provocation manslaughter, instructing the jury that it "may" consider provocation manslaughter as a lesser included offense of first degree murder and second degree murder if it found Hippensteel not guilty of both crimes or was undecided about his guilt. After describing reckless manslaughter, the court instructed on provocation manslaughter as follows:

> The second way to commit "manslaughter" is manslaughter by sudden quarrel or heat of passion. Manslaughter by sudden quarrel or heat of passion requires proof that:
>
> 1.  a. The defendant intentionally killed another person; or
>
>     b. The defendant caused the death of another person by conduct which the defendant knew would cause death or serious physical injury; or
>
>     c. Under circumstances which showed an extreme indifference to human life, the defendant caused the death of another person by consciously disregarding a grave risk of death. The risk must be such that disregarding it was a gross deviation from what a reasonable person in the defendant's situation would have done; and

2. The defendant acted upon a sudden quarrel or heat of passion; and

3. The sudden quarrel or heat of passion resulted from adequate provocation by the person who was killed. [It is no defense that the defendant was unaware of the risk solely by reason of intoxication.] "Adequate provocation" means conduct or circumstances sufficient to deprive a reasonable person of self-control. Words alone are not adequate provocation to justify reducing an intentional killing to manslaughter. There must not have been a "cooling off" period between the provocation and the killing. A "cooling off" period is the time it would take a reasonable person to regain self-control under the circumstances.

You must unanimously agree that the State has proven "manslaughter" beyond a reasonable doubt before you may find the defendant guilty of "manslaughter." However, all of you do not have to agree on whether it was "reckless manslaughter" or "manslaughter by sudden quarrel or heat of passion."

If you determine that the defendant is guilty of either second-degree murder or manslaughter but you have a reasonable doubt as to which it was, you must find the defendant guilty of manslaughter.

¶19 The trial court erred by giving the *LeBlanc* jury instruction on provocation manslaughter. First, as we explained in *Lua*, provocation manslaughter is not a lesser included offense of second degree murder. 237 Ariz. at 303 ¶ 7. Second, the *LeBlanc* instruction incorrectly told the jury it could only consider provocation manslaughter if it failed to find that Hippensteel had committed second degree murder. But, in fact, the jury was required to consider provocation manslaughter after finding that Hippensteel had committed second degree murder. *See id.* at 306 ¶ 20; § 13-1103(A)(2). Third, the *LeBlanc* instruction told jurors they "may" consider provocation manslaughter, whereas jurors were legally required to convict Hippensteel of manslaughter if he committed second degree murder upon a sudden quarrel or heat of passion resulting from adequate provocation. *See* § 13-1103(A)(2).

¶20         The court compounded the instructional error in the verdict form, which provided, in relevant part, as follows:

> Lesser-Included Offense Verdict on "second degree murder": If you find the defendant "guilty" of "first-degree murder", do not complete this portion of the verdict form. In other words, complete this portion only if you find the defendant either "not guilty" of "first-degree murder" or you are unable to decide.
>
> We the jury, duly empaneled and sworn in the above entitled action, and upon our oaths, do find the Defendant, Ricky Hippensteel, on the charge of "second-degree murder" as the result of the death of Derek Joseph Odle as follows (check only one):
>
> __ Not guilty
>
> __ Guilty
>
> __ Unable to agree
>
> Lesser-Included Offense Verdict on "manslaughter": If you find the defendant "guilty" of "first-degree murder" or "guilty" of "second degree murder," do not complete this portion of the verdict form. In other words, complete this portion only if you find the defendant either "not guilty" of both "first-degree murder" and "second degree murder" or you are unable to decide.
>
> We the jury, duly empaneled and sworn in the above entitled action, and upon our oaths, do find the Defendant, Ricky Hippensteel, on the charge of "manslaughter" as the result of the death of Derek Joseph Odle as follows (check only one):
>
> __ Not guilty
>
> __ Guilty
>
> __ Unable to agree

Complete this portion of the verdict form only if you find the
defendant "guilty" of "manslaughter."

Please indicate the number of jurors who found beyond a
reasonable doubt that the offense of "manslaughter" was
committed as follows:

__ Reckless manslaughter

__ Manslaughter by sudden quarrel or heat of passion

__ Both reckless manslaughter and manslaughter by sudden
quarrel or heat of passion

**¶21**      The verdict form contains three errors.   First, like the *LeBlanc*
instruction,  the  verdict  form  incorrectly  states  that  provocation
manslaughter is a lesser included offense of first degree and second degree
murder.   Second, the verdict form instructs jurors not to complete the
manslaughter portion if they found Hippensteel guilty of first degree or
second degree murder.   But under *Lua*, once jurors found that Hippensteel
committed second degree murder, they were required to consider whether
he committed provocation manslaughter.   Third, because the verdict form
treats provocation manslaughter as a lesser included offense of murder, it
provides no place for jurors to indicate whether they unanimously found
Hippensteel guilty or not guilty of provocation manslaughter, a distinct
offense, after finding that he committed second degree murder.   *See State
v. Garcia*, 102 Ariz. 468, 471 (1967) (stating that when the court submits
forms of verdict to the jury, "it should give a form of every kind of a verdict
that may possibly be returned by the jury").

**¶22**      For these reasons, we agree with the parties that the trial court
committed  error  by  giving  the  *LeBlanc*  instruction  on  provocation
manslaughter and then repeating the instructional error in the verdict form.

**B.     The Instructional Error Was Fundamental Error Because It Deprived Hippensteel Of A Right Essential To His Defense**

¶23         The instructional error took an "essential right" from Hippensteel if it deprived him of "a constitutional or statutory right necessary to establish a viable defense or rebut the prosecution's case." *Escalante*, 245 Ariz. at 141 ¶ 19.    Although provocation manslaughter is not a traditional defense, the right to have the jury correctly instructed on it has both statutory and constitutional dimensions.    Hippensteel possessed the right under § 13-1103(A)(2) to have the jury correctly instructed so it could meaningfully consider whether the homicide constituted provocation manslaughter rather than the more serious offense, second degree murder. *See Lua*, 237 Ariz. at 306–07 ¶¶ 19–20.    And the Due Process Clause may be implicated when a defendant is convicted of a more serious offense, despite evidence supporting a verdict on the less serious offense of provocation manslaughter.    *See Mullaney v. Wilbur*, 421 U.S. 684, 703–04 (1975).    The court's error effectively deprived Hippensteel of his right to rebut the prosecution's case for second degree murder by having the jury meaningfully consider whether to return a verdict on a less serious offense. *See State v. Valenzuela*, 194 Ariz. 404, 407–08 ¶ 16 (1999) ("By failing to give the [lesser included offense instruction], the trial court denied appellant 'a right essential to his defense' and affected the 'very foundation of [his] theory of defense.'" (second alteration in original)); *see also State v. Murray*, 250 Ariz. 543, 551 ¶ 25 (2021) ("By inviting the jury to circumvent the reasonable-doubt standard and consequently undermining Defendants' constitutional rights and safeguards, the prosecutor deprived Defendants of an 'essential right' necessary to rebut the State's case.").

¶24         Hippensteel's primary defense theory was self-defense, which was unaffected by the instructional error.    But he advanced a secondary theory in response to the murder charges by arguing that the murder was not premeditated but occurred upon a sudden quarrel or heat of passion.    *See* § 13-1103(A)(2).    Specifically, during closing argument, defense counsel argued that if the jury did not believe that Hippensteel acted in self-defense, it should find either second degree murder or manslaughter "based on the sudden quarrel, based on the argument."

¶25         The dissent faults Hippensteel for not arguing "provocation manslaughter" expressly or at length.    *See infra* ¶¶ 49–52.    But defense counsel's argument necessarily encompassed provocation manslaughter.

Counsel referred the jury to its instructions and tracked the manslaughter instruction, citing a "sudden quarrel" and the argument between Hippensteel and Odle as the basis for a manslaughter verdict. That reference to a sudden quarrel invoked the entire offense as the court defined it, including the element of adequate provocation by the victim. Counsel was not required to recite each statutory element to the jury; that is the function of the instruction. *See State v. Hunter*, 142 Ariz. 88, 90 (1984) ("The very purpose of a jury charge is to flag the jurors' attention to concepts that must not be misunderstood . . . ." (quoting *State v. Denny*, 119 Ariz. 131, 134 (1984))).

**¶26** The brevity of defense counsel's argument is unsurprising. Self-defense was the stronger theory with a potentially bigger payoff—an acquittal—and consumed most of defense counsel's argument. But a defendant does not forfeit the right to a correct instruction by emphasizing one theory over another. We, therefore, disagree with the dissent that the relative prominence of a defense theory determines whether an instructional error on that theory deprived the defendant of a right essential to his defense.

**¶27** The dissent also contends that our reliance on *Valenzuela* is misplaced because the trial court there gave no lesser included offense instruction at all, while the jury here received an instruction on provocation manslaughter. *See infra* ¶¶ 54–56. The dissent's distinction elevates form over substance. What mattered in *Valenzuela*, and what matters here, is whether the instructional error deprived the jury of a meaningful opportunity to give effect to the defendant's theory by returning a verdict on a less serious offense. As in *Valenzuela*, Hippensteel's mental state was the cornerstone of his defense: he disputed premeditation, claimed self-defense, and argued alternatively that his reaction to Odle's sudden aggression warranted a manslaughter verdict rather than murder. Each theory turned on his mental state at the moment of the killing, and provocation manslaughter offered the jury the means to give that evidence legal effect. The *LeBlanc* instruction and the accompanying verdict form foreclosed that path just as surely as the missing instruction did in *Valenzuela*. That those errors took a different form does not change their consequence. In both cases, the jury was deprived of a meaningful opportunity to return a verdict on a less serious offense supported by the evidence.

**¶28** The evidence at trial made Hippensteel's sudden-quarrel argument viable. Hippensteel testified that during his confrontation with

Odle, he turned away and, upon turning back, saw Odle raising a knife toward him. Hippensteel responded by blocking the knife with his hand, which sparked a physical struggle that ultimately resulted in Odle being stabbed. Hippensteel explained that he did not consciously think or feel during the encounter, stating, "My mind, it shut down, like, quick . . . . There was no thoughts. There was nothing there. It was just an instant of reaction." He further testified that the fight "was just survival."

¶29　　　　Hippensteel's account that Odle provoked the fight was corroborated by other evidence. Abrigo testified that "all" in the compound carried knives, from which the jury could have inferred that Odle did as well. Hippensteel sustained a minor injury to his hand, consistent with having blocked a knife. Parker testified that Hippensteel had calmed down before walking toward Odle's trailer, suggesting that Hippensteel, who was friends with Odle, was not the aggressor in the ensuing confrontation. Also, Odle's autopsy revealed methamphetamine levels "capable of causing hallucinations, aggressive behavior, and irrational reactions." From this evidence, the jury could have found Hippensteel's account credible—that Odle aggressively responded to Hippensteel's early-morning inquiry about a missing tractor by raising a knife toward him, thereby supporting an inference of adequate provocation.

¶30　　　　The *LeBlanc* instruction, together with the faulty verdict form, deprived Hippensteel of the opportunity to have the jury meaningfully consider a verdict on the less serious offense of provocation manslaughter rather than second degree murder. This constitutes fundamental error. *See Valenzuela*, 194 Ariz. at 407–08 ¶ 16.

## C.　The Instructional Error Was Prejudicial

¶31　　　　"Establishing prejudice from fundamental error varies depending on the nature of the error and the unique case facts." *Escalante*, 245 Ariz. at 144 ¶ 29. The instructional error here deprived Hippensteel of the opportunity for the jury to return a verdict for provocation manslaughter after considering legally correct instructions and an error-free verdict form. He must, therefore, show that without this error, a reasonable jury could have found him guilty of provocation manslaughter. *See id.* This inquiry "excludes imaginative guesswork." *Id.* ¶ 31. It asks whether "without the error, a reasonable jury could have

plausibly and intelligently" found Hippensteel guilty of provocation manslaughter.  *See id.*   To answer that question, we consider the entire trial record, including the evidence and the parties' arguments.  *See id.*

**¶32**        Because the jury did not find that Hippensteel premeditated the homicide or acted in self-defense, it had to determine whether his conduct constituted second degree murder, manslaughter, or negligent homicide.   We conclude that if the jury credited Hippensteel's testimony and the corroborating evidence, *see supra* ¶¶ 28-29, it could have "plausibly and intelligently" found him guilty of provocation manslaughter.

**¶33**        Hippensteel's case for provocation manslaughter is not strong.   Several witnesses portrayed him as the aggressor, and his account shifted between his initial statement to the detective and his trial testimony. But the credibility of several witnesses was impeached or otherwise called into question because of their drug use at the time of the homicide and inconsistent statements.   The jury could have believed Hippensteel's account that Odle provoked him while rejecting his self-defense theory if it concluded that a reasonable person would not have believed that deadly physical force was immediately necessary to protect against Odle's use of such force.   *See* A.R.S. § 13-405(A)(2) (providing when deadly physical force is justified).   If so, it still could have plausibly found that Hippensteel reasonably lost control and stabbed Odle upon being suddenly provoked by the raised knife, which cut Hippensteel when he blocked the knife with his bare hand.   *See State v. Harwood*, 110 Ariz. 375, 379 (1974) (stating that "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances"(quoting *People v. Danielly*, 202 P.2d 18, 27 (1949))); A.R.S. § 13-1101(4) ("'Adequate provocation' means conduct or circumstances sufficient to deprive a reasonable person of self-control."); *see also State v. Knoten*, 555 S.E.2d 391, 396 (S.C. 2001) (finding evidence of adequate provocation where defendant and victim were "in a heated encounter and she had twice cut him with a knife"); *State v. Craig*, 33 S.W.3d 597, 601 (Mo. App. 2000) (finding evidence of adequate provocation where the victim confronted the defendant and displayed a knife).   The instructional error, coupled with the faulty verdict form, therefore prejudiced Hippensteel by misinforming the jury on the law and impeding its decision whether to find him guilty of the less serious offense of provocation manslaughter.   *See Escalante*, 245 Ariz. at 144 ¶ 29.

¶34        The State argues that because the *Lua* instruction required the jury to consider provocation manslaughter if it found the elements of second degree murder, and we presume the jury followed this instruction, the jury necessarily rejected provocation manslaughter before considering the incorrect *LeBlanc* instruction.    Therefore, the State contends, Hippensteel has not shown that the *LeBlanc* instruction and verdict form prejudiced him.   Our dissenting colleague makes a similar argument.    *See infra* ¶¶ 59–66.   We disagree.

¶35        Indeed, we generally presume that the jury follows the instructions given to it.    *See State v. Rushing*, 573 P.3d 72, 83 ¶ 27 (Ariz. 2025).   But here, the jury was explicitly told it must "consider all these instructions" and not "pick out one instruction or part of one and ignore the others."   We presume the jury followed that directive, meaning it considered both the *Lua* instruction and the *LeBlanc* instruction.   It was not possible, however, to *follow* both because they directly conflicted.    *See Lua*, 237 Ariz. at 306 ¶ 19 (noting that a jury following a *LeBlanc* instruction would logically never consider provocation manslaughter).    This irreconcilable conflict overcomes any presumption that the jury followed only the correct instruction.    *See Francis v. Franklin*, 471 U.S. 307, 322–23 (1985) ("A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied . . . .").

¶36        The dissent contends that *Francis* is inapposite because it concerned a burden-shifting presumption rather than a sequencing conflict. *See infra* ¶ 60.   We cite *Francis* not for its holding that the challenged presumption violated due process, but for a narrower point that survives the dissent's distinction.    *See infra* ¶ 60.   The reviewing-court problem *Francis* identified arises whenever a jury receives two instructions that cannot both be followed.   471 U.S. at 322.   That problem turns on the irreconcilability of the instructions, not on the particular legal doctrine that produced the conflict.

¶37        Returning to this record, a reasonable jury following the jury instructions and verdict form likely would not have meaningfully considered whether Hippensteel committed provocation manslaughter. The *Lua* instruction told the jury it *must* consider provocation manslaughter if it found all the elements of second degree murder, but the *LeBlanc* instruction told jurors they *may* consider provocation manslaughter only after acquitting on, or deadlocking over, second degree murder. Compounding that conflict, the definition of "adequate provocation"

appeared only in the *LeBlanc* instruction. It is theoretically possible that the jury found second degree murder and then independently rejected provocation manslaughter after consulting the definition of "adequate provocation" in the *LeBlanc* instruction while ignoring the conflicting parts of that instruction. Accepting that possibility, however, would be like the "imaginative guesswork" we eschewed in *Escalante*. 245 Ariz. at 144 ¶ 31. The verdict form also made this scenario less likely by directing jurors to stop once they found Hippensteel guilty of second degree murder.

¶38        The jury's deliberations underscore the point. It noticed an unrelated error in the second degree murder and manslaughter portion of the verdict form and alerted the court. Specifically, the form referred to first degree murder in places where it should have referred to second degree murder and manslaughter. The judge corrected the form, brought the jury into the courtroom, and read the corrected language. After telling the jury that the new form would be provided to it, the judge concluded by saying, "[S]o as you go through your verdict form, you consider first-degree, second-degree, manslaughter, negligent homicide, so on and so forth as it relates to Count 1." The court's instruction to consider the homicide offenses in descending order compounded the prejudice. That directive, combined with the *LeBlanc* instruction's requirement that the jury acquit on second degree murder before considering manslaughter, effectively foreclosed provocation manslaughter once the jury found Hippensteel guilty of second degree murder. A jury following both instructions, in good faith, had no occasion to reach provocation manslaughter at all.

¶39        The jury then returned to deliberations with a form that provided a place for it to return a verdict on second degree murder. But, assuming the jury was following the *Lua* instruction, it had no place to mark whether it found Hippensteel guilty, not guilty, or that it was unable to return a verdict for provocation manslaughter if the jury found the elements of second degree murder. And the form told jurors not to complete the manslaughter portion of the verdict form if they found Hippensteel guilty of second degree murder. Considering the conflict between the *Lua* instruction and the *LeBlanc* instruction, the omission of a distinct place in the verdict form for the jury to enter a verdict on provocation manslaughter if it found the elements of second degree murder, and the judge's last instruction to consider each homicide in descending order of seriousness, it is likely that the jury never properly considered provocation manslaughter.

¶40	Our dissenting colleague concludes from the record that the jury necessarily followed the *Lua* instruction and rejected provocation manslaughter.	*See infra* ¶¶ 65–66.	He points to evidence contradicting Hippensteel's account and highlights juror questions as showing skepticism about his credibility.	*See infra* ¶¶ 69–79.	But that evidence supports the verdict the jury returned does not answer the question *Escalante* asks: whether a reasonable jury, properly instructed, could have plausibly and intelligently returned a different verdict.	*See* 245 Ariz. at 144 ¶ 31.

¶41	The dissent's reliance on the aggravated assault acquittal illustrates the problem.	The dissent reasons that because the acquittal could only rest on Abrigo's testimony that she was not afraid of Hippensteel, the jury "demonstrably" credited her and therefore credited her broader testimony that Odle had no knife.	*See infra* ¶¶ 75–76.	But the acquittal does not compel that inference.	Hippensteel testified that he never saw or spoke to Abrigo during or after his confrontation with Odle. A jury crediting that testimony would acquit on aggravated assault not because it believed Abrigo, but because it believed Hippensteel.	And a jury crediting Hippensteel on that point could equally credit his account of Odle's provocation.	The dissent's inference is one possible reading of the acquittal.	It is not the only one, much less the necessary one.

¶42	More fundamentally, even if the dissent's inference were correct, it answers the wrong question.	*Escalante* does not ask what this jury concluded from one piece of one witness's testimony under flawed instructions.	It asks whether a reasonable jury, properly instructed, could have plausibly and intelligently returned a verdict for provocation manslaughter on the full record.	As explained, it could.	*See supra* ¶¶ 28–29.	The dissent's contrary view, based on its detailed catalog of juror questions and witness credibility points, asks us to weigh the evidence and predict what this jury would have done if properly instructed.	This is precisely the inquiry *Escalante* forecloses.	*See* 245 Ariz. at 144 ¶ 29.

¶43	For these reasons, we conclude that the instructional error impeded the jury from deciding whether Hippensteel was guilty of the less serious offense of provocation manslaughter.	Because the jury could have plausibly and intelligently found Hippensteel guilty of that offense if properly instructed, the error prejudiced him.	*See id.*	We, therefore, reverse his conviction for second degree murder and remand for a new trial on that count.

### D.  On Remand, The Trial Court Should Expand On The *Lua* Instruction And Provide A Correct Verdict Form

**¶44**      On retrial, the court should not give a *LeBlanc* instruction on provocation manslaughter.    Instead, it should expand on the *Lua* instruction and provide a correct verdict form.    The *Lua* instruction should include a definition of "adequate provocation."    Hippensteel and amicus ask us to resolve which party bears the burden of proving provocation manslaughter.    Relatedly, the State asks us to approve proposed revisions to the RAJIs addressing provocation manslaughter, which do not resolve the burden-of-proof issue.    Because these matters were raised for the first time in supplemental briefing, we decline to address them or to approve the proposed RAJIs.    Those questions are better resolved with the benefit of full briefing from all interested parties.    On remand, therefore, the trial court should determine which party bears the burden of proof and instruct the jury accordingly.    Finally, the verdict form should include a distinct option allowing the jury to indicate whether it finds Hippensteel guilty, not guilty, or unable to reach a verdict on provocation manslaughter.

### CONCLUSION

**¶45**      For all these reasons, we vacate the court of appeals' opinion, reverse the trial court's judgment and sentence for second degree murder, and remand for a new trial on the homicide charge.    We affirm Hippensteel's convictions and sentences for the other charges.

18

MONTGOMERY, J., dissenting:

**¶46** Because manslaughter under A.R.S. § 13-1103(A)(2) is a lesser *degree* offense—not a lesser *included* offense—I join the Majority in concluding that the trial court erred by giving a *LeBlanc* instruction on provocation manslaughter. *See supra* ¶ 18; *State v. Lua*, 237 Ariz. 301, 303 ¶ 7, 306 ¶¶ 19–20 (2015). I also agree that the trial court erred by providing a verdict form that likewise treated provocation manslaughter as a lesser included offense of first and second degree murder. *See supra* ¶¶ 19–21. I part company with the Majority, however, on whether these errors require a new trial, and, therefore, respectfully dissent.

## I.    FUNDAMENTAL ERROR

**¶47** Because Hippensteel did not timely object to the jury instructions, he bears the burden of establishing that the error was both fundamental and prejudicial. *See State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). An instructional error is fundamental if, "consider[ing] the totality of the circumstances," it (1) goes "to the foundation of the case," (2) deprives "the defendant [of] a right essential to his defense," or (3) is "so egregious that he could not possibly have received a fair trial." *Id.* at 142 ¶ 21. Here, the Majority finds that the instructional error deprived Hippensteel of a right essential to his defense because it "impeded" his ability to establish his secondary defense to premeditated murder. *Supra* ¶¶ 23–24. I disagree for the reasons that follow.

### *A. Hippensteel's Actual Defense*

**¶48** The Majority's holding that fundamental error occurred under the second prong of *Escalante* is based on the conclusion that Hippensteel was impeded in his ability to establish his secondary defense of provocation manslaughter. *Supra* ¶ 24. But "consider[ing] the totality of the circumstances," the record does not support the Majority's conclusion regarding what Hippensteel argued. *See Escalante*, 245 Ariz. at 142 ¶ 21.

**¶49** Hippensteel's defense at trial was self-defense. He also argued there was no evidence of premeditation. In his opening statement, Hippensteel's counsel told the jury that "[w]hat happened was in self-defense" and that "[Hippensteel] acted in self-defense." In his closing argument, defense counsel stated that "[Hippensteel] was forced to react

and he was justified." He specifically emphasized the self-defense jury instruction, stating, "If evidence was present that raised this justification defense, so it was—there was evidence because you're getting the jury instruction . . . . They need to prove to you, beyond a reasonable doubt, that it's not self-defense for each claim." Lastly, Hippensteel's counsel noted that "the State has not presented evidence to you that [the defendant] intended or knew that he would cause the death of another person." Overall, defense counsel mentioned self-defense fifteen times and premeditation fourteen times.

¶50        In stark contrast, the only reference to a sudden quarrel in the defense closing argument occurs midway through counsel's argument on premeditation:

> Second degree murder. The difference here is premeditation. So again, if you believe that Ricky caused the death and he intended and wanted that to happen, then I would say that second degree or manslaughter would be the way it was, based on *the sudden quarrel*, based on the argument, based on the yelling that Katie describes in the 911 call, as she describes to Detective Ruiz, as she describes to Detective Houghland, and even as she describes partially to Detective Armstrong that there was—there they were out there for a while. There was screaming, there was yelling. They were banging up against the trailer, then she heard ow. That's not premeditation.

(Emphasis added.)

¶51        Counsel concluded his argument by stating:

> Now, I'm going to ask you to come back and find Ricky not guilty of first[]degree murder, not guilty of second degree murder, not guilty of manslaughter, not guilty of negligent homicide, not guilty of aggravated assault, and not guilty of resisting arrest.

> Now, again, like I talked about before, if you don't believe that Ricky did act in self-defense, then this is a manslaughter negligent homicide case, and you need to decide between that on what happened.

¶52        That is it for adequate provocation or a sudden quarrel. Defense counsel never addressed the relevant instruction nor emphasized any evidence for the jury to consider regarding an adequate provocation defense.  The Majority has argued for adequate provocation more than Hippensteel ever did.  Instead, Hippensteel's defense was self-defense, and the lack of premeditation was a secondary defense.  The Majority's assertion that a drive-by reference to a sudden quarrel invokes the entire offense, *supra* ¶ 25, overlooks the actual argument made, rests on no authority, and will prove difficult to manage in future cases.

¶53        Therefore, the Majority's holding that the erroneous instructions—concerning a defense Hippensteel never relied upon—deprived him of a "right essential to [the] defense" is unsupported by the record before us.  *See Escalante*, 245 Ariz. at 140 ¶ 13 (quoting *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005)).  And "an Arizona appellate court should not reverse a case on the ground of fundamental error unless its analysis *of the entire record* permits it to set forth reasons clearly demonstrating that the case falls within our definition of fundamental error."  *State v. Gendron*, 168 Ariz. 153, 155 (1991) (emphasis added).

### B.   Adequate Provocation Instruction

¶54        The Majority's reliance on *State v. Valenzuela*, 194 Ariz. 404 (1999), to conclude the jury was deprived of considering adequate provocation is problematic.  *Supra* ¶ 23.   In *Valenzuela*, the defendant—charged with first degree murder—argued throughout the trial that he intended only to frighten, not to kill the victim.  *Id.* at 407 ¶ 16.  "His intent, therefore, became the cornerstone of his defense and provided the key component or 'battleground' of the case."  *Id.*  Nevertheless, the trial court failed to instruct the jury on the lesser included offense of reckless manslaughter.  *Id.* at 405 ¶ 1.

¶55        Thus, the jury was absolutely precluded from considering evidence of intent regarding reckless manslaughter.   "Failure to permit the jury to consider this evidence under a reckless manslaughter instruction removed from the jury the 'option of convicting on a . . . less drastic alternative' than either first[] or second[]degree murder, and precluded the appellant from receiving 'the full benefit of the reasonable-doubt standard.'"   *Id.* at 407 ¶ 13 (quoting *State v. Celaya*, 135 Ariz. 248, 253 (1983)).  Unsurprisingly, this Court found fundamental error.  *Id.* at 408

¶ 16.

**¶56** In contrast, the trial court instructed Hippensteel's jury on the need to consider adequate provocation. *Supra* ¶ 17. There is a significant difference between what the jury here was instructed and what the jury in *Valenzuela* was prevented from considering. *Valenzuela* addressed a different instructional error regarding a different type of offense with a very different consequence, and its reasoning is inapposite to the record before us.

**¶57** Because the jury was instructed on adequate provocation, regardless of Hippensteel's actual argument, he was not deprived of a right essential to his defense. Therefore, although there was an error in the instructions given to the jury, under the totality of the circumstances, it does not amount to fundamental error. And even if there was fundamental error, there is no prejudice for the following reasons.

## II. PREJUDICE

**¶58** To establish prejudice under fundamental error review, Hippensteel must show that, absent the error, a reasonable jury could have "plausibly and intelligently" found him guilty of provocation manslaughter. *Escalante*, 245 Ariz. at 144 ¶ 31. The inquiry "excludes imaginative guesswork." *Id.* And "we examine not only what [Hippensteel] and his lawyer presented at trial, but the evidence as a whole and the State's theory of the case." *State v. Fierro*, 254 Ariz. 35, 43 ¶ 29 (2022). Furthermore, "any questions posed by jurors during trial or deliberation may be pertinent in applying the [prejudice] standard objectively." *Escalante*, 245 Ariz. at 144 ¶ 32.

### A. Conflicting Instructions

**¶59** We do not presume the worst of juries; we presume they follow the law and the instructions they are given. *See State v. Manuel*, 229 Ariz. 1, 6 ¶ 24 (2011); *State v. LeBlanc*, 186 Ariz. 437, 439 (1996). "[I]n the absence of evidence in the record demonstrating that the jury failed to follow its instructions, we presume the jury did so . . . ." *State v. Felix*, 237 Ariz. 280, 285 ¶ 17 (App. 2015). The record does not demonstrate that the jury failed to follow the *Lua* instruction. Nevertheless, the Majority concludes from the conflict between the two instructions that "it was not possible for the jury to have followed both." *Supra* ¶ 35. That much is

22

true. The instructions provided two avenues for considering adequate provocation. But when instructions conflict, the most that can be said is that the jury could not have followed both. We cannot infer from that conflict alone, though, that the jury ignored the correct instruction that they had to review to return the verdict for second degree murder.

¶60 The Majority's effort to rely on *Francis v. Franklin*, 471 U.S. 307 (1985), for the proposition that when two instructions directly conflict, there is "no way of knowing which of the two irreconcilable instructions the jurors applied," is misplaced. 471 U.S. at 322; *supra* ¶ 35. *Francis* addressed a constitutionally defective presumption of intent that shifted the burden of proof on an element of the offense. 471 U.S. at 318. The conflicting presumptions involved an instruction concerning a mandatory evidentiary presumption followed by an instruction that prohibited a presumption. *Id.* at 322. These instructions maintained a presumption on the one hand and prohibited it on the other. The *Lua/LeBlanc* conflict is structurally different.

¶61 The *Lua* instruction, embedded in the second degree murder instruction, required a resolution of adequate provocation as a precondition to any second degree murder conviction. The *LeBlanc* instruction prescribed a sequential manner that required a jury to first consider first and second degree murder before considering evidence in support of a provocation manslaughter verdict. In either instance, the jury is going to consider second degree murder first, which, given the *Lua* instruction, will result in consideration of adequate provocation.

¶62 The Majority cites *Lua* for the proposition "that a jury following a *LeBlanc* instruction would logically never consider provocation manslaughter." *Supra* ¶ 35. That may very well be true if a trial court only issued a *LeBlanc* instruction. But that is not what happened here. The jury received both: first the *Lua* instruction and then the *LeBlanc* instruction. *Supra* ¶¶ 17–18. So, unlike in *Lua*, the jury had to consider adequate provocation manslaughter. And the Majority correctly observes that the *Lua* instruction required the jury—if it found all elements of second degree murder—to consider whether the killing occurred upon a sudden quarrel or heat of passion, and, if it so found, to convict Hippensteel of manslaughter rather than second degree murder. *Supra* ¶ 16; *see Lua*, 237 Ariz. at 306 ¶ 20. Furthermore, the *Lua* instruction, embedded in the instruction addressing the second degree murder charge, was read to the jury before deliberations. Thus, even though the *LeBlanc* instruction was

also given, the jury was aware of the role of adequate provocation when deliberating on the second degree murder charge. Importantly, the *LeBlanc* instruction's contrary directive did not eliminate or replace the *Lua* instruction from the jury's deliberative framework; it created a conflict the jury had to navigate. Moreover, *State v. Eddington*, 226 Ariz. 72, 82 ¶ 32 (App. 2010), makes it clear that a *LeBlanc* instruction does not prevent the jury from considering adequate provocation manslaughter. The *Lua* instruction required the jury—using mandatory language—to resolve the provocation question before returning a second degree murder verdict. Ultimately, the *Lua* instruction explicitly preserved Hippensteel's opportunity to have the jury consider adequate provocation as part of the second degree murder deliberation.

¶63          Lastly, the jury was explicitly instructed:
You must consider all these instructions. Do not pick one instruction or part of one and ignore the others. As you determine the facts, however, *you may find that some instructions no longer apply. You must then consider the instructions that do apply, together with the facts as you have determined them.*

(Emphasis added.)

Thus, the fact that some instructions may have conflicted with others does not mean that the jury could not have properly reasoned through them. The record reveals that the jury's verdict followed a determination that the *LeBlanc* instruction did not apply after considering adequate provocation and settling on a second degree murder verdict.

*B. The Jury Followed The Lua Instruction*

¶64          The Majority has no record of what the jury considered during deliberations. Instead, the Majority speculates that "a reasonable jury following the jury instructions and verdict form likely would not have meaningfully considered whether Hippensteel committed provocation manslaughter." *Supra* ¶ 37. It then infers from the combination of the instructions and verdict forms that the jury probably skipped the provocation inquiry and then uses that inference to find prejudice. This is not an objective inquiry into what a reasonable jury could have done—it is the retrospective guesswork *Escalante* prohibits. *See Escalante*, 245 Ariz. at 144 ¶ 31.

¶65         Instead, the inference most consistent with the record is that the jury followed the *Lua* instruction and rejected provocation before convicting on second degree murder.   It is the most rational reconstruction of the jury's deliberative path given the verdict the jury returned and the record before us.   They could not have bypassed the *Lua* instruction while reading the second degree murder instruction—with or without the *LeBlanc* instruction.

¶66         The Majority's alternative inference—that the jury might have skipped the provocation inquiry despite the *Lua* instruction's clear mandate—is sheer speculation without any support in the record.   And "[t]his court must presume that the trial jury was composed of persons of average intelligence and judgment, and that they used common sense in considering the evidence presented in connection with the instructions given by the court."   *Citizens Utils. Co. v. Firemen's Ins. Co.*, 73 Ariz. 299, 302 (1952); *see also Escalante*, 245 Ariz. at 144 ¶ 31 (using the same language from *Citizens Utils. Co.* to define a "reasonable jury").   And careful consideration of the provocation instruction would not have resulted in a different verdict, given the record before us.

*C. The Record Does Not Support a Verdict for Provocation Manslaughter*

¶67         The Majority acknowledges that Hippensteel's case for provocation manslaughter is "not strong" and that "[s]everal witnesses portrayed him as the aggressor."   *Supra* ¶ 33.   Despite these concessions, the Majority nonetheless finds prejudice by speculating that the jury might have credited Hippensteel's impeached, internally inconsistent account. *Supra* ¶ 29.   The Majority's prejudice analysis further rests on the premise that if properly instructed, a reasonable jury could have credited Hippensteel's account and found adequate provocation.   *Supra* ¶¶ 26–28. This is more of the "imaginative guesswork" that *Escalante* forbids. *Escalante*, 245 Ariz. at 144 ¶ 31.   And this jury was not taken by Hippensteel's account.

¶68         The record reveals that the jury was fully engaged in following witness testimony.   Jurors took their role as fact finders seriously, as evidenced by the fact that they asked witnesses more than fifty questions.   *Supra* ¶ 10.   And eighteen of those questions were asked of Hippensteel, whose testimony the Majority asserts a reasonable jury could have found credible.   *Supra* ¶ 29.   Such an assertion is not plausible on this record.

¶69   A review of the substance of the questions asked of Hippensteel reveals the jury's careful—and skeptical—consideration of his testimony, *see infra* ¶ 74, which necessarily informed the jury's rejection of Hippensteel's self-defense theory and return of a verdict of second degree murder. The jury's verdict further reflects a finding that Hippensteel was the aggressor, not a person suddenly provoked into a lethal confrontation. Considering the entire record, including defense counsel's argument, the jury questioning the manslaughter verdict forms, the questions asked of Hippensteel and other witnesses, and the ultimate verdict, it all points to one conclusion: the jury did not find Hippensteel's account credible and reasonably determined that the provocation manslaughter instruction did not apply. *See also State v. Garcia*, 220 Ariz. 49, 51 ¶ 7 (App. 2008) (concluding that a jury in similar circumstances was not precluded from considering manslaughter).

¶70   In support of its assertion that a jury could have credited Hippensteel's account, the Majority cites Donald Parker's testimony as evidence of provocation. *Supra* ¶ 29. In particular, the Majority notes Parker's observation that Hippensteel "calmed" before approaching the trailer. *Id.* But, as the Majority notes, *supra* ¶ 5, Parker also testified that Hippensteel announced, before approaching, that he was "going to kill Odle for ransacking his place earlier that morning." A deliberate statement of lethal intent followed by a moment of calm is evidence of premeditation, not sudden passion. *See* A.R.S. § 13-1101(1) (defining premeditation as "mean[ing] that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection"). Because the jury did not find that Hippensteel killed Odle with premeditation, there is no reason to give Parker's related testimony the weight the Majority seeks to give it.

¶71   Significantly, multiple eyewitnesses contradicted Hippensteel's account that Odle raised a knife at him and provoked the confrontation. Kathleen Abrigo testified in detail as to what she observed about Hippensteel's fight with Odle. She was specific about how she could see from inside the trailer through a window with an unobstructed view, corroborated by photos of the trailer that are part of the evidentiary record. In particular, Abrigo testified that Odle did not have a knife and did not take any action against Hippensteel. Abrigo's testimony thus also clearly rebuts Hippensteel's claim that his hand injury came from blocking a knife wielded by Odle. *Cf. supra* ¶ 29. And she saw Hippensteel

standing over Odle with a knife after Odle collapsed.

¶72        Other witness testimony further undermined Hippensteel's version of events.   Jonathan Kelly testified that Hippensteel made "a beeline" toward Odle and appeared to punch him, and that Odle did not fight back.   Lorena Cluck testified that Hippensteel said there "might be a murder" on the property.   Ruben Ruiz saw Hippensteel—appearing angry—holding a knife and directing Abrigo not to call 911.   And, as noted, Parker testified that Hippensteel said he was "going to kill Odle."

¶73        Against this testimony, Hippensteel admitted to lying to the detective who first spoke with him, claiming he had not seen Odle for two weeks and had not visited the compound in years.   His trial account—that Odle suddenly raised a knife at him and that he then found himself in a fight he could not remember—was directly contradicted by the witness with the clearest view of the encounter, Abrigo.

¶74        The jury's questions for Hippensteel reveal just how much credit they gave his testimony.   Jurors asked, among other questions: "Why did you not call 9-1-1 if you were stabbed?"; "You were seeking out Derek on behalf of the two waiting in the truck.   After . . . unsuccessfully confronting Derek about the tractor, why didn't they seek Derek out themselves?"; "What happened to the blood on your shirt between the incident with Derek and the day you were arrested?"; "At the end of your fight with Derek, immediately before you walked away, was he still holding the knife?"; "Are you saying you and Derek fought, but Derek was not stabbed during the fight?"; and "If you didn't remember the conversation with Detective Armstrong, how can you be sure you didn't stab Derrick?"   These questions probed specific gaps and inconsistencies in Hippensteel's account—his missing bloody clothing, his claim not to remember stabbing Odle, and his selective amnesia regarding Detective Armstrong—and reflect the jury's close attention to his testimony and deep skepticism of it.   A reasonable jury, properly instructed and engaged as this jury clearly was, could not have overlooked the problems inherent in Hippensteel's testimony.

¶75        And even if the jury discounted the testimony of all the other witnesses for various reasons, *see supra* ¶ 10, the jury obviously credited Abrigo's testimony of her interactions with Hippensteel.   Although the State charged Hippensteel with "using a knife, a deadly weapon or dangerous instrument, intentionally did place Kathleen Gabrielle Abrigo in

reasonable apprehension of imminent physical injury," Abrigo testified she told Hippensteel she wasn't afraid of him and stated that "I wasn't. I'm still not." Accordingly, the jury found Hippensteel not guilty of committing aggravated assault against her.

¶76    A reasonable jury that accepted Abrigo's testimony, as this jury demonstrably did, could not plausibly and intelligently have found adequate provocation given that her testimony directly contradicted Hippensteel's version of events. Thus, the fact that adequate provocation was only defined in the manslaughter instruction, aside from the fact that it was also read to the jury before deliberating, does not help establish prejudice under these facts.

¶77    Finally, the Majority's reliance on Odle's toxicology report to support adequate provocation illustrates how the Majority's review of the record falls short. The Majority states that "Odle's autopsy revealed methamphetamine levels 'capable of causing hallucinations, aggressive behavior, and irrational reactions.'" *Supra* ¶ 9. But there is more.

¶78    Dr. Colleen Klein, the Maricopa County Medical Examiner, testified on cross-examination to the results of Odle's toxicology report. Dr. Klein testified that the report revealed that there was 470 ng/mL of methamphetamine in Odle's blood. Hippensteel's counsel had Dr. Klein read into the record two comments in the report concerning methamphetamine. The first stated that "Methamphetamine is a DEA schedule two stimulant drug capable of causing hallucinations, aggressive behavior and irrational reactions." The second provided that "Blood levels of 200 to 600 nanograms per milliliter have been reported in methamphetamine abusers who exhibited violent and irrational behavior." Nevertheless, Dr. Klein was unable to say just when Odle had used drugs. The jury also had questions for Dr. Klein.

¶79    The jury asked three questions. The first question was "Can a person with 470 nanograms per milliliter blood methamphetamine level sleep?" Dr. Klein answered, "Yes." The second question asked, "Can drug levels go up after death?" Dr. Klein again answered, "Yes." The third and final question asked, "Based on the autopsy, can you say whether or not the deceased fought back?" Dr. Klein answered, "I cannot say that with any sort of certainty. What I can say is that there were no other injuries other than those two stab wounds." The jury's questions regarding methamphetamine reveal that it was well aware of the toxicology

report. But the whole of the record does not provide the corroboration asserted by the Majority. *See supra* ¶ 29.

¶80 The record further demonstrates that the jury was engaged and conscientious about fulfilling its duties, which informs whether a reasonable jury could have reached a different verdict. At the outset of deliberations, a juror identified an error in the verdict forms—they incorrectly referenced "first degree murder" rather than "second degree murder" and "manslaughter," respectively, in the lesser included offense verdict forms. On the jury's own initiative, the jury brought the error to the trial court's attention. *See LeBlanc*, 186 Ariz. at 439 (observing that juries "possess both common sense and a strong desire to properly perform their duties").

¶81 The trial court, acknowledging that "one of the jurors who apparently is a much better proofreader than any of us," caught the error and corrected the forms before deliberations continued. Any conclusion that this jury disregarded the *Lua* instruction or would have failed to flag further verdict-form issues is unsupported by the record. And a reasonable jury—equally attentive and duty-bound—would have followed suit.

¶82 The Majority's treatment of the judge's remark during the verdict form correction—"consider first[]degree, second[]degree, manslaughter, negligent homicide, so on and so forth"—as independently "compounding" prejudice is misplaced. And the context matters. The judge made that remark in direct response to an error the *jury itself* caught and flagged—affirmative evidence of conscientious deliberation. Additionally, the judge's passing comment tracked the general structure of the verdict form; unlike the *LeBlanc* instruction, it did not affirmatively tell jurors to acquit on second degree murder before considering provocation.

¶83 And any speculation that the jury would have bypassed considering adequate provocation because of the errant verdict forms fails to account for the jury's actions in bringing other verdict form issues to the court's attention. If this jury wanted to convict Hippensteel of provocation manslaughter and the verdict form presented an issue, the record tells us they would have brought it to the court's attention, as well.

¶84 These questions, along with those asked of Hippensteel and the other witnesses, are also pertinent to "applying the [prejudice] standard

objectively." *Escalante*, 245 Ariz. at 144 ¶ 32. The Majority's treatment of the *Escalante* standard, *supra* ¶ 39, threatens to render it meaningless. The standard "is an objective one, and requires a showing that without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *Escalante*, 245 Ariz. at 144 ¶ 31. This requires a court to engage with particularity the record before it and not guess at what a jury might have done in the alternative. Otherwise, on most records, the evidence could theoretically permit any potential verdict, and the standard as the Majority employs it would be easily met. Yet "appellate relief for fundamental error" is supposed to occur only in "rare cases." *Id.* The Majority's analysis here, which will invariably guide future appellate courts and litigants, will render review regarding errant jury instructions a de facto structural error review.

¶85 To avoid the kind of speculation that *Escalante* precludes, this jury's conduct informs how a reviewing court should engage with the entire record to determine whether a reasonable jury could have reached a different verdict if properly instructed. Given what the record demonstrates the jury was able to do *with* the errant instructions and verdict forms, no reasonable jury "[c]omposed of persons of average intelligence and judgment, [using] common sense in considering the evidence presented in connection with the instructions given by the court" could have plausibly and intelligently found adequate provocation *without* the errant instructions and verdict forms. *Citizens Utils. Co.*, 73 Ariz. at 302; *see also Escalante*, 245 Ariz. at 144 ¶ 31. Therefore, there is no prejudice.

### III.  CONCLUSION

¶86 The trial court's instructions and verdict form were erroneous. However, the record demonstrates that no fundamental error occurred, and it affords no reasonable basis for concluding that a properly instructed jury would have reached a different verdict. The *Lua* instruction embedded in the second degree murder instruction, regardless of the errant *LeBlanc* instruction, required the jury to consider adequate provocation before returning the verdict it did. There is no prejudice. I would affirm the court of appeals' opinion and Hippensteel's conviction for second degree murder.